**Amy Baggio, OSB #011920**
**amy@baggiolaw.com**
**Baggio Law**
**621 SW Morrison, Suite 1025**
**Portland, OR 97205**
**Tel:    (503) 222-9830**
**Fax:    (503) 274-8575**

**Attorney for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **No. 3:16-mj-00004** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER** |
| **JOSEPH O'SHAUGHNESSY,** | |
| **Defendant.** | |

**PROCEDURAL POSTURE**

On January 26, 2016, Joseph O'Shaughnessy was arrested in Burns, Oregon.  He and seven others were charged in a federal complaint with conspiring to impede, by force, intimidation, or threat, officers from discharging their duties in the Malheur National Wildlife Refuge in violation of 18 U.S.C.§ 372. (CR-14)  On January 27, 2016, Mr. O'Shaughnessy made his first appearance in federal court on the complaint.  (CR-15.)   At that initial hearing, the Court set a preliminary hearing for February 3, 2016, and scheduled arraignment on any subsequent indictment for February 24, 2016.  (CR-16.)  Also at this first appearance, the government asked the Magistrate Judge to defer a release decision for two days, until Friday, January 29, 2016.

On January 29, 2016, the Magistrate Judge held a detention hearing pursuant to 18 U.S.C. § 3142(f). (CR-32.) United States Pretrial Services submitted a report to the Magistrate Judge in advance of the hearing. The report recommended Mr. O'Shaughnessy be released. After receiving evidence and hearing argument from the parties, the Honorable Stacie Beckerman – the same judge who found probable cause to issue the complaint – concluded that the defense presentation at the release hearing was "compelling, especially the fact that Mr. O'Shaughnessy has not -- did not spend meaningful time within the refuge with the other -- the group of armed occupiers. I find that to be a compelling fact in his favor." In light of her findings, the Magistrate Judge ordered Mr. O'Shaughnessy released on conditions. (CR-32.) The government asked Judge Beckerman to stay the order so that it could seek review. On February 1, 2016, the government filed a motion to revoke Judge Beckerman's release order. (CR-44.) This Court has scheduled a hearing on the government's motion for February 2, 2016, at 11:00 a.m.

**APPLICABLE LAW**

### *The Basic Framework*

The Bail Reform Act, 18 U.S.C. § 3142(b), creates a presumption for release on one's own personal recognizance unless the judicial officer finds that release will not reasonably assure the appearance of the person as required, or will endanger the safety of the community or any person. If the Court determines that recognizance release will not reasonably ensure both the defendant's appearance and the safety of the community, §3142(c) directs the Court to release the person on "the least restrictive" condition or set of conditions. Detention is appropriate only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §3142(f).

***The Government's Burdens***

In seeking detention, the government bears the burden of proof as to both risk of flight and danger to the community.  The standards of proof differ for each prong; the government must establish flight risk by a preponderance of the evidence and danger by clear and convincing evidence.  *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); *United States v. Motamedi*, 767 F.3d 1403, 1406 (9th Cir. 1985).  The federal rules concerning admissibility of evidence in criminal trials are inapplicable. 18 U.S.C. § 3142(f). The Court may base its findings on proffer and hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir.1986).

***Factors Weighing On The Release Decision***

Factors to be considered by the Court in assessing release or detention include: the nature and circumstances of the alleged offense; the weight of the evidence; the history and characteristics of the person; and the risk of danger to any person or the community in general.  18 U.S.C. §3142(g).

***Standard Of Review***

Review of the facts underlying a magistrate judge's release order is *de novo*.  *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990); *United States v. Lopp*, 2015 WL 5139367 (N.D. Ca. Sept. 1, 2015) (same).

**APPLICATION OF THE LAW TO THE FACTS IN THIS CASE**

***The Nature And Circumstances Of The Offense & The Weight Of The Evidence***

Mr. O'Shaughnessy is charged with conspiring, or agreeing together, with co-conspirators to prevent by force, threat, or intimidation, U.S. Fish and Wildlife officers from discharging their duties at the Malheur National Wildlife Refuge (MNWR) in violation of 18 U.S.C. § 372.  The nature and circumstances of the offense and weight of the evidence appear to be the factors argued

most strenuously by the government as favoring detention.  However, consistent with the findings of the Magistrate Judge, a closer review of the complaint, combined with additional evidence proffered by the defense, illustrates the true frailty of any claim that Mr. O'Shaughnessy agreed to work with others to take over the refuge.

The affidavit attached to the complaint sets forth four primary occurrences in an attempt to establish probable cause against the eight codefendants: (1) The Hammonds' Sentencing; (2) Armed Occupier Activity In Harney County, October 5-December 31, 2015; (3) January 2016 Takeover Of The MNWR; and (4) Social Media Reports And Posts.

### 1.      The Hammonds' Sentencing, Complaint Pages 3-5

Mr. O'Shaughnessy had no involvement in the Hammonds' case.  He did, however – like the original sentencing judge – believe that five-year mandatory minimum sentences for the two men was too harsh a punishment.  Such belief is no basis to find Mr. O'Shaughnessy either a danger or a flight risk.  Strike One.

### 2.      Armed Occupier Activity, Complaint Pages 5-7

As part of its presentation on probable cause, the complaint alleges several events that the federal agent claims took place in Harney County from October 5 until December 31, 2015. Initially, the defense notes that this section is referred to as "Armed Occupier Activity;" however, as discussed in more detail below, Mr. O'Shaughnessy is not one of the armed occupiers.  As to the other allegations in this subsection, the defense submits:

- Mr. O'Shaughnessy ***was not in Oregon*** in October 2015 to meet with Sheriff Ward (compare Complaint, page 5, paragraph 12);

- Mr. O'Shaughnessy ***was not in Oregon*** at the time of the videos posted to "Harney County Liberty News" from December 12-15, 2015 (compare Complaint, page 5, paragraph 13-14);

- Mr. O'Shaughnessy *was not in Oregon* at the time of the troubling incident involving a BLM employee on December 18, 2015 (compare Complaint, page 6, paragraph 14); and

- Mr. O'Shaughnessy *was in Oregon* on December 26, 2015, when a video was posted in which Mr. O'Shaughnessy and others asked for "patriots" to travel to Burns to march in support of the Hammonds.

Thus, on the face of the complaint, three of the four allegations in this section do not involve Mr. O'Shaughnessy and have absolutely no bearing on him as either a danger or flight risk. Mr. O'Shaughnessy was specifically named in the fourth occurrence: participation in a video asking people to travel to Burns to show their support of the Hammonds. Participating in a video that asks others join in the Hammonds March is equal parts peaceful assembly and protected speech. The government should refrain from arguing protected conduct as a basis for pretrial detention. In sum, the allegations in the "Armed Occupiers Activity" section of the complaint provide no evidence to suggest Mr. O'Shaughnessy is either a danger or a flight risk. Strike Two.

**3.    January 2 Takeover Of MNWR, Complaint Pages 7-11**

Mr. O'Shaughnessy was one of *hundreds* of protestors who came to Burns to show their support for the Hammond family. Mr. O'Shaughnessy is proud to have participated in the peaceful march in support of the Hammond family on January 2nd.

It was immediately after the Hammond March that the occupiers left to take over the refuge. In both its complaint (page 7, paragraph 17) and in its Memorandum In Support of Detention (page 6), the government claims that Mr. O'Shaughnessy was a leader of the group of occupiers and that he was one of the first to occupy the refuge. These accusations are patently untrue. Mr. O'Shaughnessy neither led the occupiers, nor participated in the takeover. To the contrary, as the defense will proffer in this proceeding, Mr. O'Shaughnessy made numerous statements among Hammond March participants that the takeover was wrong.

The defense proffers that Doug Cox arrived in Burns for the Hammond March on January 1, 2016. Mr. Cox stayed the night at the home of local Burns residents with Mr. O'Shaughnessy and many of the men who would later occupy the MNWR.

Immediately after the Hammond March on January 2nd, a small number of individuals went up to the refuge. Mr. Cox reports neither he nor Mr. O'Shaughnessy left with the occupiers to take over the MNWR. Mr. Cox states that Mr. O'Shaughnessy stated repeatedly and unequivocally during this initial time that he disagreed with the others' decision to take over the refuge. In addition to Mr. Cox, another witness named Maureen Peltier also states that she saw Mr. O'Shaughnessy at the fairgrounds after the march and after the occupiers had left for the refuge.

Later on the evening of January 2nd, a group of individuals staying at The Silver Spur Motel[1] left the motel to drive up to the gate of the MNWR to see if rumors of a road block were true. According to both Doug Cox and Maureen Peltier, Mr. O'Shaughnessy refused to even travel with the group up to the front gates of MNWR on January 2nd, let alone cross over and join the occupiers.

Mr. O'Shaughnessy's refusal to join the occupiers was not without consequences. Mr. Cox reported that he overheard Mr. O'Shaughnessy on the telephone at the Silver Spur as occupiers angrily chastised him as a traitor for his refusal to participate in the occupation. The occupiers unsuccessfully tried to convince Mr. O'Shaughnessy over the phone to change his mind and join them. Mr. O'Shaughnessy stood his ground and told the occupiers that they were the ones in the wrong.

Similarly, Ms. Peltier reported that when she visited the front gate to the MNWR on the night of January 2nd, some of the occupiers told her that they were furious with Mr. O'Shaughnessy for

_____

[1]The Defense has Motel receipts as well as the proffered testimony of the owner of the motel to establish Mr. O'Shaughnessy stayed at The Silver Spur for much of the month of January.

**Page 6   DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER**

refusing to join them.  Ms. Peltier said the occupiers referred to O'Shaughnessy as a "traitor" who had "betrayed them" by refusing to join them in the occupation.

Despite his disagreement with the occupiers, Mr. O'Shaughnessy remained in the area for almost a month after the occupation began.  This is because while Mr. O'Shaughnessy disagreed with the takeover, he hoped to act as a neutral witness to the federal authorities' response to the takeover.  He set up a medical tent with others who were opposed to the takeover, but who wanted to make sure that death or injury did not come to anyone during the course of the occupation.

The defense will proffer the testimony of two men who traveled from Nevada to Oregon for such a role.  Gary Underhill and Daniel Malavenda went with Mr. O'Shaughnessy on an almost daily basis up to the refuge to try to convince the occupiers to open communications with law enforcement and to de-escalate the situation.  Both Mr. Underhill and Mr. Malavenda, both former law enforcement officers themselves, state that they were personally present for the brief, but almost daily meetings between themselves, Mr. O'Shaughnessy and the occupiers.  They state that Mr. O'Shaughnessy stated consistently, and unequivocally, that the occupation was wrong and encouraged the occupiers to work with law enforcement to end it.

The defense proffered Mr. Underhill's information at the initial detention hearing, but Mr. Malavenda's corroborating information is new and in addition to that which the Magistrate Judge found compelling at the previous hearing.  The nature and circumstances of the offense fail to carry much weight when the evidence of innocence is significant.  In sum, Strike Three.

### 4.    Social Media And News Reports, Pages 11-31

In the complaint, the government lists numerous online postings by multiple occupiers as proof of the occupiers' intent.  Of these twenty pages of allegations, only one paragraph – Paragraph 30 – pertains to Mr. O'Shaughnessy.  The video referred to in this paragraph was recorded *outside*

the refuge on January 5 or 6, 2015.[2]  In the video Mr. O'Shaughnessy is talking about the occupiers inside the refuge.  He states that people may disagree with the occupiers' tactics, but that people should still support their message.  He asks others to join him in the "buffer zone" outside the fence and protest peacefully.  While it is true that the recording refers to a security force, this statement is made in the context of preventing violence, not escalating it.  And while it is also true that Mr. O'Shaughnessy refers to people deciding for themselves if they want to go into the refuge or stay in the buffer zone, this statement is made by a non-co-conspirator, outside the refuge.  Most importantly as to the question of release, Mr. O'Shaughnessy does not advocate violence. In the context of the clearly established record that Mr. O'Shaughnessy disagreed with the occupiers about the takeover from the very start, the video hardly makes for a slam-dunk case.  Strike Four.

### *The History And Characteristics Of The Person*

Pretrial Services conducted an investigation of Mr. O'Shaughnessy and concluded he was a suitable candidate for release.  As set forth in the report, Joseph O'Shaughnessy is a 43 year-old former firefighter and emergency medical technician (EMT) who worked for eleven years for the in Glen Ellyn, Illinois.  He is healthy and has no history of mental illness.

He resides with his mother in Cottonwood, Arizona, in a fully-owned home located on a fully-owned a parcel of land.   Mr. O'Shaughnessy works various contract jobs to provide income. Mr. O'Shaughnessy's mother confirms that her son is welcome to return home and live with her on her "mini-farm" pending outcome of this case.

---

[2]In the affidavit supporting the complaint, the affiant states that the video was filmed either on the MNWR or outside of it, but the next sentence states that a Fish and Wildlife Officer confirms the video was recorded outside the refuge. Complaint at 14, paragraph 30.  Nevertheless, the government again claims in its Memorandum in Support of Pretrial Detention that the video was taken "on the MNWR."  Page 6.  This is untrue.  The video was recorded outside the refuge.

Mr. O'Shaughnessy has extremely limited criminal history.  He has a misdemeanor conviction from June 2007 for having a "dog at large" without a collar.  He has a second misdemeanor, a failure to appear on a citation for driving offense from January of 2008.  Other than these two misdemeanors dating back over eight years, he has no prior convictions.

In sum, Mr. O'Shaughnessy's personal history and characteristics weigh toward release.

***The Risk Of Danger To Any Person Or The Community***

Mr. O'Shaughnessy is no danger.  In any other case charging a Class D Felony to a 43 year-old former firefighter/EMT, with a stable place to live, no history of violence, no mental illness, no felony record, and a minimal record of two misdemeanors from eight years in the past, the government would concede the defendant is not a danger.  In its Detention Memorandum, the government refers  to the fact that Mr. O'Shaughnessy was in a vehicle with guns when he was arrested.  That is true.[3]  Mr. O'Shaughnessy was in a vehicle with retired police officer Underhill and former police officer Malavenda.  All three men were exercising their constitutionally protected rights to bear arms.  Like its reliance on making a video to encourage people to attend a parade, or its reliance on participating in the parade itself, the government has again argued constitutionally protected conduct as a basis for pretrial detention.  The Court should reject these arguments; Mr. O'Shaughnessy is not a danger.

**CONCLUSION**

The charge and the circumstances surrounding the charge are what arguably make this case different from release decisions in other Class D Felony cases.  However, as established in this Response, Joseph O'Shaughnessy had no *agreement* with co-conspirators to take over the MNWR.

---

[3]It is also true that Mr. O'Shaughnessy cooperated fully with officers and was arrested without incident.

He had a *disagreement* with the occupiers about decision to take over the MNWR.  This is a distinction that makes every difference in a charge of conspiracy.

Based on this Response and additional information to be presented at the hearing, the defense respectfully requests that the Court find that the government has failed to meet its burdens of proof as to either risk of appearance or danger to the community and deny the government's Motion to Revoke the Magistrate Judge's Release Order.  We ask that the Court order Mr. O'Shaughnessy released from custody.

Respectfully submitted on February 2, 2016.

                    */s/ Amy Baggio*
                    Amy Baggio, OSB #011920
                    503-222-9830
                    Attorney for Defendant O'Shaughnessy