Thomas K. Coan, OSB #89173
tom@tomcoan.com
Attorney at Law
1001 SW Fifth Ave., Suite 1400
Portland, OR  97204
(503) 221-8736

Attorney for Defendant Peter Santilli

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:16-mj-00004** |
| **Plaintiff,** | |
| **vs.** | **AMENDED MEMORANDUM IN SUPPORT OF MOTION TO REVOKE PRETRIAL DETENTION ORDER** |
| **AMMON BUNDY, JON RITZHEIMER, JOSEPH O'SHAUGHNESSY, RYAN PAYNE, RYAN BUNDY, BRIAN CAVALIER, SHAWNA COX, and PETER SANTILLI,** | |
| **Defendants.** | |

### I.   Procedural Background

On January 27, 2016, Santilli made his first appearance on the Complaint in this case.  The Court detained Santilli pending a detention hearing on January 29. At the conclusion of the hearing on January 29, 2016, Judge Beckerman stated that it was a "close case" that she needed to take the matter under advisement and issue a ruling by Monday. Today Judge Beckerman issued an order detaining Santilli as both a flight risk and a

Page 1 – MEMORANDUM IN SUPPORT OF MOTION TO REVIEW DETENTION

danger to the community.  A copy of the detention order is attached and marked as Exhibit A.

**II.      Summary of Defendant's Position and Plan**

It is our position that Santilli is neither a flight risk nor a danger and that the Government failed to meet the burden of proof on both factors.  Santilli has a long history of lawful behavior and stable residency, and he has never had any mental health issues. He now resides in an apartment in Cincinnati, Ohio that he shares with his longtime friend and business partner, Deborah Jordan. They operate an Internet news and talk show from a studio in this apartment. His landlord reports he is a good tenant.

Santilli has a solid release plan that should provide the Court with ample assurance of safety and his appearance in court.  Santilli wants to return home to his residence in Ohio, and he is willing to comply with any reasonable conditions the Court may want to impose to assure community safety and his appearance in court, including home detention and GPS monitoring.  Given his long history of lawful, nonviolent conduct, these conditions should provide the Court with reasonable and sufficient assurances.

Santilli is also not a flight risk. Everyone who knows him reports that he will not only appear for trial, he will do so enthusiastically.

Santilli wants to be allowed to continue to produce his news and talk shows, as this is his livelihood. If the Court finds conditions are necessary to assure his appearance and/or the safety of the community, consistent with the Bail Reform Act, Santilli asks the Court to impose the least restrictive conditions necessary to provide the Court with reasonable assurances for these needs relating to court appearances and safety to the community.

////

////

### III.    The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3142, any person charged with an offense under the federal criminal laws shall be released pending trial: (a) on personal recognizance; (b) upon execution of an unsecured appearance bond; or (c) on a condition or combination of conditions, unless a "judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *see also,* 18 U.S.C. § 3142(a), (b). The Act mandates that a court impose the least restrictive conditions to reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(c)(1)(B).

The right to release pending trial, absent a sufficient contrary showing, is not simply a matter of statutory law, but a matter of a defendant's Fifth and Eighth Amendment rights. *See United States v. Hir*, 517 F.3d 1081, 1085-86 (9th Cir. 2008), explaining that a reviewing court must ensure that a pretrial detention order is "'consistent with the defendant's constitutional and statutory rights,'" quoting *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990), and citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985), as explaining that "[t]he Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected").

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, § 3142(g) identifies factors that the judicial officer is to take into account,

including "the nature and circumstances of the offense charged"; "the weight of the evidence against the person"; "the history and characteristics of the person," including, inter alia, the person's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The burden of proof is on the government to show by clear and convincing evidence that the defendant poses a danger such that "no condition or combination of conditions will reasonably assure the safety of any other person and the community . . . ." 18 U.S.C. § 3142(f)(2). The Act is silent about the standard of proof required when the government seeks pretrial detention due to flight risk, but the Ninth Circuit has held that flight risk must only be shown by the lower "clear preponderance of the evidence" standard. *Lopez-Valenzuela v. Cty. of Maricopa*, 719 F.3d 1054, 1065 (9th Cir. 2013), citing *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

**IV.    Background Information**

Pete Santilli is 50 years old.  He grew up in Latham, New York, graduated from high school and immediately enlisted in the Marines. He spent four years in the service, achieving the rank of Lance Corporal. He received an honorable discharge in about 1989 and moved out to California.  He earned an associates degree from California State College in Long Beach in about 1991.  He met and married Catherine Santilli in California, and they lived together with their two daughters for approximately 20 years in Hesperia, California.  Their marriage eventually deteriorated, and their divorce became final in the

last two years.  Catherine Santilli reports that her husband is not a flight risk and that "the court can take him at his word."

Except for a minor incident when Santilli was still a teenager, he has led a law-abiding life. He has one prior conviction, a misdemeanor, for disorderly conduct in 1983 when he was 18 years old. He has no other criminal convictions.

For the past several years, Santilli has worked as an independent news journalist producing a daily news show and a talk show through ThePeteSantilliShow.com, Talknetwork.com, Guerilla Media Network, and YouTube. Approximately four and a half years ago, Santilli met Deborah Jordan through a social media group.  She became a frequent caller into his talk show, *The Pete Santilli Show*, and eventually became a co-host on his morning show called *Off the Hook in the Morning with Pete Santilli and Deb Jordan*. Like public radio, his shows are listener supported. They depend on listener donations and sponsorships. *The Pete Santilli Show* has nearly 65,000 followers on YouTube. See Exhibit B.

In addition to being co-hosts on the radio talk show, Santilli and Ms. Jordan have had a steady personal relationship for the past four or more years.  They have resided together for most of that time. In February 2015, they moved from California to Cincinnati, Ohio so they could be closer to Ms. Jordan's family. She was born and raised in Ohio and has many relatives there.  Ms. Jordan has no criminal history and would agree to act as a responsible third party, agreeing to report to the court any non-compliance with the release order.

Santilli and Ms. Jordan produce their new shows from a studio in their Cincinnati apartment. The equipment includes high-end computers with production software, servers,

microphones and other equipment necessary to produce and broadcast their news productions. Their landlord reports they are good tenants.

Towards the end of December 2015, Santilli and Jordan drove out to Burns, Oregon to cover a rally in support of Dwight and Steven Hammond.  Through his website, news show and YouTube channel, Santilli put out a rallying call of supporters to join them in Burns for the January 2, 2016 rally in support of the Hammonds.

At some point during the rally, there was a split in the group. A small minority splintered off after devising a plan to occupy the buildings on the MNWR.  Santilli did not know of this ahead of time, and once he learned of it he expressed his opposition to it because it was not lawful. See Exhibits C and D.  He never joined the occupiers, but he continued to report on the developing story.  During the time he was in the Burns area Santilli called for others to come to Oregon, however he never called for them to join the occupiers and he never called for them to do anything unlawful.

**V.    Santilli's News Shows are Protected by the First Amendment**

The United States Supreme Court has long held that the First Amendment's protections of the press extend beyond recognized, mainstream media.  In *Mills v. Alabama,* 384 U.S. 214, 219 (1966), the Court noted that the press, for First Amendment purposes, "includes not only newspapers, books, and magazines, but also humble leaflets and circulars . . . ."  Five years later, in *Branzburg v. Hayes,* 408 U.S. 665, 704 (1972), the Court held that "liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who uses the latest photocomposition methods."  The use of the term "press" should not distract from the reach of First Amendment protection: "We protect the press to ensure the vitality of

First Amendment guarantees. This solicitude implies no endorsement of the principle that speakers other than the press deserve lesser First Amendment protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 783 (Brennan, J., dissenting) (1985); *see also Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 691 (1990) (Scalia, J., dissenting), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers."). Put succinctly, "this Court has made plain that the organized press has a monopoly neither on the First Amendment nor on the ability to enlighten." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 774, n.4 (White, J., concurring) (1985) (internal citations omitted).

The Ninth Circuit has recognized that the Supreme Court "has repeatedly refused . . . to accord greater First Amendment protection to the institutional media than to other speakers." *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1290 (9th Cir.) *cert. denied,* 134 S. Ct. 2680 (2014). In considering a defamation case involving a self-proclaimed "investigative blogger," the Ninth Circuit overturned the Oregon district court[1] and held that the "protections of the First Amendment do not turn on whether the defendant was a trained journalist, formally affiliated with traditional news entities, engaged in conflict-of-interest disclosure, went beyond just assembling others' writings, or tried to get both sides of a story." *Id.* at 1291 (9th Cir.). The court relied on Supreme Court reasoning that "a First Amendment distinction between the institutional press and other

---

[1] *Obsidian Fin. Grp., LLC v. Cox*, No. CV-11-57-HZ, 2011 WL 5999334, at *5 (D. Or. Nov. 30, 2011).

speakers is unworkable: 'With the advent of the Internet and the decline of print and

broadcast media . . . the line between the media and others who wish to comment on

political and social issues becomes far more blurred.'" *Id.* (quoting *Citizens United v. FEC*,

558 U.S. 310, 352 (2010)).

  In the modern era, "humble leaflets and circulars" and "carbon paper or a

mimeograph" have evolved into blogs, YouTube channels, public access television shows,

and social media.  Unconventional news gatherers utilize these platforms for information.

*See, e.g.*, *Fordyce v. City of Seattle*, 840 F. Supp. 784, 791 (W.D. Wash. 1993) *aff'd in part,*

*vacated in part, rev'd in part on other grounds,* 55 F.3d 436 (9th Cir. 1995) (noting, in

1993, how "'newsgathering' these days is often done by private citizens who have no

connection with any news medium, but whose contribution to the flow of public

information is important."); *Crawford v. Geiger*, 996 F. Supp. 2d 603, 614 (N.D. Ohio

2014) ("Technology has put the ability to gather and disseminate newsworthy information

literally in the hands of anyone who has a cell phone.").[2]  Similarly, the First Circuit has

emphasized that

> [i]t is of no significance that the present case . . . involves a private
> individual, and not a reporter, gathering information about public officials.

---

[2]  A line of cases suggests that recreational photography or filming for personal use is
not protected by the First Amendment because it lacks an "identifiable message sought to
be communicated, [and] an identified audience to whom a message [is] being broadcast."
*Montefusco v. Nassau Cnty.,* 39 F.Supp.2d 231, 242 n. 7 (E.D.N.Y.1999) (suggesting, but
not holding, that a schoolteacher's photography of teenagers was not protected by the First
Amendment); *see also Porat v. Lincoln Towers Community Ass'n,* No. 04 Civ. 3199(LAP),
2005 WL 646093, at *4–5 (S.D.N.Y. Mar. 21, 2005) (holding that a photo hobbyist's
recreational photography of residential buildings was not protected).
  Whatever the merits of that legal proposition, it does not apply here, where
Defendant undoubtedly was engaging in expressive conduct that he intended, and did,
disseminate to his audience.  His YouTube channel has nearly 65,000 subscribers.

*** 

> [C]hanges in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper. *Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status.*

*Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (emphasis added); *see also Fordyce v. City of Seattle*, 840 F. Supp. 784, 791 (W.D. Wash. 1993) *aff'd in part, vacated in part, rev'd in part on other grounds,* 55 F.3d 436 (9th Cir. 1995) ("There is no doubt that plaintiff's First Amendment rights as an unconventional news-gatherer are equal to those of an employee of a mainstream television station.").

As these cases indicate, in reviewing the scope of the freedom of the press, "[t]he dispositive element is not the form of the investigative process. In an era marked by a diminution of the classic news media and the print investigative journalist and the proliferation of investigative reporting in media such as cable television, documentary journalism—both televisions and movies—internet reporting and blogging, the need for protection remains the same." *Ramos v. Flowers*, 429 N.J. Super. 13, 26, 56 A.3d 869, 877 (App. Div. 2012) (considering both state and federal free speech provision).

Like the "humble leaflets and circulars" in *Mills,* and despite no affiliation with a major media group, Defendant's productions are entitled to First Amendment protection, including freedom of the press.

## VI.    The nature and circumstances of the offense

The Complaint charges Santilli and others with Conspiracy to impede federal officers from discharging or preforming their official duties through the use of force,

intimidation or threats in violation of 18 U.S.C. § 372. Here, a group of individuals took over and occupied the buildings at the Malheur National Wildlife Refuge (MNWR) thereby preventing federal employees from doing their work on the refuge. The charge is a Class D felony and carries a maximum penalty of 6 years in prison.

The allegations specifically relating to Santilli are set out in paragraphs 42 – 56 in the Complaint. In summary, it alleges that Santilli is associated with two patriot groups, "Oath Keepers" and III Percent Patriots and that he used his news show to announce calls for patriots and like-minded people to come to Oregon. The Complaint fails to state that the patriot groups named above were opposed to any armed conflict or takeover. See, Exhibit E.

Santilli's calls for supporters to come to Oregon were first aimed at rallying support of the Dwight and Steven Hammond who had been sentenced to serve five-year mandatory minimum prison terms. A public rally in support of the Hammonds was set to occur on January 2, 2016 in Burns, OR. So, along with Deb Jordan and production assistants Ken Rhoades and Ben Matthews, Santilli drove here with drove from the Midwest to Burns to cover the Hammond Rally.

Santilli was not an occupier. To the contrary, Santilli disagreed with the takeover of the buildings on the Refuge; he publicly expressed his opposition to it, and he talked others out of joining in the occupation. He never stayed at the Refuge. They checked into the Silver Spur Motel in Burns, on December 30, 2015 and intended to check out on January 2, 2016. See Exhibit F.

On January 2, 2016 a significant number of people gathered in the parking lot at the Safeway store in Burns as part of the rally in support of the Hammonds. It was there that

Santilli learned that a group splintered off from the rally and proceeded to the MNWR to take it over.  Upon learning of this, Santilli expressed his opposition.  He said if he had known of the plan ahead of time, he would have tried to talk the group out of it.

The group that splintered off from the others who gathered in support of the Hammonds for the January 2nd rally was just a small minority of a much larger group that came to Burns.  Santilli sided with the majority who did not agree with the means the occupiers used to make their message.  His only alleged involvement was to broadcast what was happening at the MNWR together with his views and put out calls for supporter to join in peaceful protest.

**VII.    Defendant's speech was not designed to incite violence or breach of the peace.**

First Amendment rights do not apply to speech designed to incite immediate violence or unlawful activity.  In *Brandenburg v. Ohio*, 395 U.S. 444 (1969), the Supreme Court ruled that only speech that is "directed to inciting or producing imminent lawless action" can be legally censored. "Fighting words" are also illegal; in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72 (1942), the Court ruled that speech that "inflict injury or tend to incite an immediate breach of the peace" has no social value and can be curtailed.

Here, the criminal complaint alleges that Defendant posted videos on YouTube of *other people* making statements about holding a "defensive posture" while carrying a firearm or requesting that other people come to the Refuge and join the group.  Aff. at 14, 24.  It also alleges that he posted videos of *himself* asking people to "come to Oregon" or "respond to Oregon" and stated that "We're going to take a stand .... Ok, I'm sure they had original intentions to be extremely peaceful. Ah, of course, ah, we, ah, we must get the Federal government to comply with our peaceful demands, ah, otherwise we have to

explore all opportunities that we have made available to us through our founding fathers."

Aff. at 24.  Although he mentions the power of being armed, his call for "one hundred

thousand" people to stand together specifically asks for "unarmed" people on at least five

occasions.  Aff. at 27-28.  He further notes that he is not armed with a firearm, just with

him mouth and his show.  Aff. at 27.  Although he does state that it's time for patriots to

"staff up" and "get in the car and come out here," (and implies that this means arming

themselves), he specifies that it must be done lawfully. Aff at 31.

Nothing indicates that this was intended to incite immediate violence, injury, or

unlawful activity.  Defendant never expresses a desire for violence, notes that they have

peaceful demands, asks multiple times for unarmed people, and then only asks for people

to arm themselves if they can do it legally.

**VIII.    The history and characteristics of the person.**

Santilli has a solid history of lawful conduct and employment.  He has just one

prior conviction from 1983; he has no mental health issues, no history of drug or alcohol

abuse, and a long, stable history of residency.  He ahs been involved in producing talk

shows and news shows for several years. He moved to Ohio last year to be closer to

Deborah Jordan's family.  It is true that he is estranged from his own family and has not

had contact with his parents or siblings for approximately three years.  While he does not

reside in Oregon, this should not preclude his release.  He has a good lot of valuable

production equipment in his studio in Cincinnati.

**IX.    The nature and seriousness of the danger to any person or the community that
    would be posed by the person's release.**

Under 18 U.S.C. § 3142(g), the Court is to consider the nature and seriousness of the danger to any person to the community that would be posed by the defendant's release. Based on the Complaint, the nature and seriousness of any danger Santilli could pose is all based on his first amendment rights relating to free speech, peaceful assembly and free press. The allegations in the Complaint suggest Santilli used these rights aid and abet the conspiracy to take over the federal buildings at MNWR. He denies this, as his intentions were always peaceful. However, given the nature of this case, any restrictions on Santilli's freedom should be limited to curtailing the perceived threat of danger posed by his speech.

a)    **What restrictions can the court place on Mr. Santilli and his show as part of his pretrial release conditions?**

"Without question, a defendant who is under court supervision, including based upon a conditional pretrial release order, does not necessarily forfeit all of his or her First Amendment rights." *United States v. Murtari*, No. CRIM 5:07-CR-0428DEP, 2008 WL 687434, at *4 (N.D.N.Y. Mar. 11, 2008).  Limitations on free speech must be imposed "cautiously."  *United States v. Collins*, No. 11-CR-00471-DLJ PSG, 2012 WL 3537814, at *4 (N.D. Cal. Mar. 16, 2012).[3]  Accordingly, a court is required to fashion release conditions to result in no greater intrusion on a defendant's First Amendment rights than reasonably necessary in order to effectuate the objectives of the Bail Reform Act (18 U.S.C. § 3142) and to insure a defendant's compliance with the court's order.  The Bail Reform Act mandates that a court impose the least restrictive conditions to reasonably

---

[3] The *Collins* Court remarked that "case law addressing the limits on pretrial release conditions imposed by the First Amendment is limited" but that it seemed "clear that the First Amendment can restrict pretrial conditions imposed on defendants . . . ."

assure the appearance of the person as required and the safety of any other person and the community.  18 U.S.C. § 3142(c)(1)(B).

In *Murtari*, the defendant had a long history of engaging in activities near a federal building designed to draw attention to his cause (advocating for fathers' rights).  While he faced contempt charges, his release conditions prohibited him from entering peaceably onto federal property.  The defendant challenged this pre-trial release condition on First Amendment grounds, but the court deemed the conditions reasonable and limited to encroaching upon defendant's First Amendment rights only to the extent necessary.  The court reasoned that the defendant had previously been charged and convicted of engaging in criminal conduct at a federal building and had "indicated that he cannot assure the Court that he will not engage in identical conduct during the pendency of [the criminal proceedings in which that order was issued]." *Murtari*, No. CRIM 5:07-CR-0428DEP, at *4.

In *Collins*, the defendant faced charges of interfering with a protected computer.  Specifically, the indictment alleged that the defendant was a member of Anonymous and had participated in a conspiracy to attack PayPal's computer servers in retribution for PayPal suspending a donation account for WikiLeaks.   The release conditions included not accessing Internet Relay Chats, not accessing Twitter, designating the computer that would be used while on release, not delete any Internet history, and make available any designated computer for inspection by the government.  *Collins*, No. 11-CR-00471-DLJ PSG, at *4.

The defendant challenged the release conditions on First Amendment grounds.  The court reasoned that since the PayPal crime was coordinated through chat relay (and was

specifically addressed by the language of the indictment) the relay chat restriction furthered a compelling government interest in protecting the public from further crimes. The court also emphasized that the condition was content-neutral—it did not restrict political or any other discourse by any other means, even by use of other internet services such as e-mail, blogging, chat other than relay chats, or social networks.  The court found that a restriction on relay chat use, while permitting substantial Internet use for purposes that include political discourse, struck a reasonable balance between the legitimate and yet competing interests of the parties.  *Id.*

In contrast to the relay chat restriction, the court struck the restriction on using Twitter.  The court reasoned that although the government's proffer mentioned Twitter, the indictment made no mention of Twitter, and thus nothing proffered by the government sufficiently linked the defendant's allegedly criminal activities to use of a Twitter account: "In the absence of any indictment charge, any evidence, or even any specific proffer of such illicit activity by Twitter, the court is not persuaded that the restriction advances any legitimate interest in protecting the public's safety or prevent any defendant from fleeing. "  *Id.* at *5.

Under the reasoning in *Collins*, the court should not restrict Defendant's use of any social media or broadcasting platform that is not mentioned in connection to the alleged crime.  Review of the affidavit shows that the only media he used is his YouTube channel.  Thus, there should not be any restriction on his Facebook page, podcast, or other social media, even for political speech.  Notably, unlike in *Collins* where the defendant's use of relay chat directly caused harm, the affidavit offers no indication that Defendant's use of YouTube actually caused anyone to go to Oregon, to the Refuge, or to arm themselves.

Thus, if Defendant's YouTube show has failed to cause the public harm, there is little

compelling government interest in protecting the public from further crimes.  It is also

notable that the situation at the Refuge has changed significantly from when Defendant

posted those videos.  The number of occupiers has dropped, the leaders are no longer there,

and the leaders have called on the remaining occupiers to leave.  Thus, the risk of

Defendant's speech causing public harm has become minimal as the situation has cooled

off.

## X.    Conclusion

For these reasons, Santilli asks the Court to order his release to his apartment in

Cincinnati, Ohio. If the Court finds it necessary, Santilli is willing to comply with

additional restrictions such as home detention or GPS monitoring. If the Court finds it

necessary to restrict Santilli's first amendment rights, it should limit them in a narrow

fashion, such as refraining from certain topics.

DATED this 2nd day of February 2014.

*Thomas K. Coan*[4]
Thomas K. Coan, OSB 89173
Attorney for Defendant

---

[4] Attorney Emily Elison provided substantial assistance with this brief on very short notice
for which I am very grateful.

ORP DET ORD (1/15/16)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

    v.

PETER SANTILLI

Case No. 3:16-MJ-00004-8

ORDER OF DETENTION AFTER HEARING (18 USC § 3142(i))

☑ On motion of the Government involving an alleged:
    ☑ risk to the safety of any other person or the community for cases involving crimes described in 18 USC § 3142(f)(1)
    ☑ serious risk defendant will flee;
    ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,
☐ Upon consideration by the court *sua sponte* involving a:
    ☐ serious risk defendant will flee;
    ☐ serious risk defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror or attempt to do so,

Having considered the nature and circumstances of the offense charged, the weight of evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person and to the community that would be posed by the defendant's release, the court finds that:

☐ The offense charged creates a rebuttable presumption in 18 USC § 3142(e) that no combination of conditions will reasonably assure the safety of the community.

☑ No condition or combination of conditions will reasonably assure the appearance of defendant as required due to:
    ☐ Foreign citizenship and/or illegal alien  ☐ In custody/serving sentence  ☐ Substance use/abuse
    ☐ ICE Detainer  ☐ Outstanding warrant(s)  ☐ Unknown family/employment/community ties
    ☐ Deportation(s)  ☐ Prior failure(s) to appear  ☑ Unstable/no residence available
    ☐ Multiple or false identifiers  ☑ Mental health issues  ☐ Information unverified/unverifiable
    ☐ Aliases
    ☐ Prior criminal history, ☐ including drug/drug related offense, ☐ including alcohol/alcohol related offense
    ☐ Prior supervision failure(s), ☐ Including illicit drug use, ☐ including alcohol abuse
    ☑ Other: *Lack of ties to district; no appropriate release plan; nature of charged offense; role in charged offense; October 2015 statement admit complying with government order*

☑ No condition or combination of conditions will reasonably assure the safety of other persons and the community due to:
    ☑ Nature of offense  ☐ Prior supervision failures
    ☐ Arrest behavior  ☐ Substance use/abuse
    ☑ Possession of weapon(s)  ☑ Mental health issues
    ☐ Violent behavior  ☐ Alleged offense involves child pornography on the internet
    ☐ Prior criminal history, ☐ including drug/drug related offense,  ☐ including alcohol/alcohol related offense
    ☐ Prior supervision failure(s), ☐ Including illicit drug use,  ☐ including alcohol abuse
    ☐ Other: _____

☐ Other (writ/serving federal or state sentence): _____

☐ Defendant has not rebutted by sufficient evidence to the contrary the presumption provided in 18 USC § 3142(e).

☐ The defendant is detained without prejudice to further review by the court at a later date.

**THEREFORE, IT IS ORDERED** that:
    1.  Defendant is detained prior to trial;
    2.  Defendant is committed to the custody of the Attorney General for confinement in a corrections facility separated, as far as practicable, from persons awaiting or serving sentences or being held in custody pending appeal;
    3.  Defendant shall be afforded a reasonable opportunity for private consultation with his counsel;
    4.  The superintendent of the corrections facility in which defendant is confined shall make the defendant available to the United States Marshal for the purpose of appearance in connection with any court proceeding.

DATED: ~~January 29, 2016~~
Feb. 1, 2016

United States Magistrate Judge

1 - DETENTION ORDER

Exhibit A



Exhibit B

# Cincinnatian spokesman for ranchers in Oregon standoff

 **Fatima Hussein**, fhussein@enquirer.com    *2:01 p.m. EST January 7, 2016*



*(Photo: The Enquirer/Meg Vogel)*

A Cincinnati-area online talk radio host has emerged as the spokesman for the armed ranchers occupying buildings at a wildlife refuge in Oregon.

Peter Santilli, who hosts The Pete Santilli Show, a neoconservative online radio show, says he embedded himself with the group in late December.

On Jan. 3, the group took over a federal wildlife refuge in Oregon to protest the federal government's treatment of a pair of ranchers set to report to prison for arson of federal land.

Santilli said he did not participate in the takeover of a cluster of small buildings at the Malheur National Wildlife Refuge, about 30 miles south of Burns, in the high desert of eastern Oregon, "because that is an illegal action."

"I'm here as an independent media journalist, coordinating major international media coverage of this event," he said.

The events began when Dwight Hammond, 73, and Steven Hammond, 46, lit fires on federal land in 2001 and 2006 to reduce the growth of plants and protect their property from wildfires. The father-son pair were convicted three years ago and served time – Dwight Hammond three months, Steven Hammond one year.

In October, a federal judge in Oregon ruled the Hammonds' prison terms were too short under U.S. law and ordered them back to jail for roughly four years each.

Ammon Bundy, the son of Nevada rancher Cliven Bundy, who was involved in a April 2014 standoff with the government over grazing rights, is among those organizing the opposition at the Oregon wildlife refuge. The protesters say ranchers and others should be free to use the federal lands in question without federal oversight.

Santilli said he was chosen as a spokesman because he took part in Cliven Bundy's defiance of federal court orders related to his cattle grazing illegally on federal lands since the 1990s.

Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:16-mj-00004 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | DECLARATION OF BRANDON |
| | ) | CURTISS |
| AMMON BUNDY, | ) | |
| JON RITZHEIMER, | ) | |
| JOSEPH O'SHAUGHNESSY, | ) | |
| RYAN PAYNE, | ) | |
| RYAN BUNDY, | ) | |
| BRIAN CAVALIER, | ) | |
| SHAWNA COX, and | ) | |
| PETER SANTILLI | ) | |
| Defendants. | ) | |

I, Brandon curtiss, declare under penalty of perjury that the following statements are truthful:

1.      To the best of my knowledge, Pete Santilli, did not know of any plan to occupy the buildings on the Malhuer National Wildlife Refuge (MNWR) before it took place, and after it took place he expressed many times his opposition to it.

2.      I know that Pete Santilli drove out to Burns, Oregon to cover rally in support of the Hammonds who had been sentenced to five years in prison. I was present in the Safeway parking lot in Burns when Pete learned that a group had splintered off to go to the

Exhibit D

MNWR. When Peter learned of the takeover of the buildings, he expressed opposition to it and said that if he had known ahead of time he would have tried to talk them out of it.

3.      In fact, I saw Pete talk Joe O'Shaughnessy out of joining them. I believe it was the evening of January 2, 2016. We were in the kitchen area of the fairgrounds building in Burns. Joe O'Shaughnessy was very emotional and upset; he was considering going to the MNWR to join the occupiers. Pete helped talk him out of it. While I cannot recall the exact words, he told Joe O'Shaughnessy not to join them. He said, "don't get yourself wrapped up in that. It's not smart to do that." He successfully talked Joe out of joining the occupiers and offered to rent a room for him at the Silver Spur Motel.

4.      Over the past month, I have spent most of my nights in room 121 of the Silver Spur Motel, and I know that Pete Santilli and his crew were in rooms 123 and 125.

5.      During the entire time Pete was out here in Burns he said many times that he did not agree with the takeover at the MNWR.

6.      I have known Pete Santilli since January 2, 2015

7.      I believe Pete Santilli is an honest and non-violent man. I know him to be a man of his word, I am sure he will make his court appearances if released. I also believe he does not pose a threat of danger to any individual or to the community.

DATED this __1__ day of _February_____, 2016

Brandon Curtiss

Exhibit D



MAIN  ABOUT  BYLAWS  CPT ⏷  ACADEMY ⏷  TESTIMONIALS ⏷  MEMBERSHIP ⏷  DONATE  STORE  FORUMS  CONTACT ⏷

# The Hammond Family Does NOT Want an Armed Stand Off, and Nobody Has a Right to Force One On Them



👤 2165   👤 0   👤 0   👤 11        👤 by Stewart Rhodes , 📅 January 1, 2016

> **We cannot force ourselves or our protection on people who do not want it.  Dwight and Steven Hammond have made it clear, through their attorney, that they just want to turn themselves in and serve out their sentence. And that clear statement of their intent should be the end of the discussion on this.  No patriot group or individual has the right or the authority to force an armed stand off on this family, or around them, against their wishes.  You cannot help someone who does not want your help, and who are not willing and ready to take a hard stand themselves.**

Here is a video statement I made on the Hammond situation while at a recent Oath Keepers event in Idaho:

Stewart on Hammond Family Situation in Oregon        🕓  ↱



And here is an even more recent audio/video statement on this issue, where I am joined by several Oath Keepers who were at Bundy Ranch, Sugar Pine Mine, and other Oath Keepers operations:













Exhibit E

01/30/2016 2:59 PM FAX  5415733921                                    ☑0001/0007

## SILVER SPUR MOTEL
789 North Broadway • Burns, OR 97720
541-573-2077   1-800-400-2077

Name _PETER SANTILLI_

Address _____

City & State _CINLINNATI , OHIO_  Zip _45230_

Phone _____

Car License _____ State _OHIO_

Make of Car _GMC_  Year _2016_

Signature _____

DL# _____ CC# _____

☐ CASH      ☐ DISCOVER    ☐ DINERS CLUB
☒ VISA      ☐ AMEX        ☐ DIRECT BILL
☒ MC        ☐ ATM DEBIT   ☐ CHECK
☐ TRADE     ☐ DONATED

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

_Thank You_

| | Room - Unit |
|---|---|
| Date In _12-30-15_ | _125_ |
| Date Out _1-2-16_ | _123_ |
| Rate $ _53.90_ | No. In Room |

**DAYS OCCUPIED**

| | | |
|---|---|---|
| SUN. | | |
| MON. | | |
| TUES. | | |
| WED. | ╳ | |
| THU. | ╳ | |
| FRI. | ╳ | |
| SAT. | | |
| TOTAL DAYS | | 6 |
| Total Room Charge | 294 | — |
| Misc. | 15 | — |
| Tax | 29 | 40 |
| AMOUNT PAID | 338 | 40 |

---

## SILVER SPUR MOTEL
789 North Broadway • Burns, OR 97720
541-573-2077   1-800-400-2077

Name _Deb Jordan_

Address _P.O. BOX_

City & State _Cincinatti OH_  Zip _45230_

Phone _5_____

Car _____ State _____

Make of Car _GMC_  Year _2016_

Signature _Deb Jordan_

DL# _____ CC# _____

☐ CASH      ☐ DISCOVER    ☐ DINERS CLUB
☐ VISA      ☐ AMEX        ☐ DIRECT BILL
☒ MC        ☐ ATM DEBIT   ☐ CHECK
☐ TRADE     ☐ DONATED

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

_Thank You_

| | Room - Unit |
|---|---|
| Date In _1-2-16_ | _123_ |
| Date Out _1-4-16_ | _125_ |
| Rate $ _53.90_ | No. In Room |

**DAYS OCCUPIED**

| | | |
|---|---|---|
| SUN. | ╳ | |
| MON. | | |
| TUES. | | |
| WED. | | |
| THU. | | |
| FRI. | | |
| SAT. | ╳ | |
| TOTAL DAYS | | 2 |
| Total Room Charge | 196 | — |
| Misc. _Pet_ | 10 | — |
| Tax | 19 | 40 |
| AMOUNT PAID | 225 | 60 |

Exhibit F

# SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

Name _PETER SANTILLI_

Address _ON FILE_

City & State _____ Zip _____

Phone _____

Car License _____ State _____

Make of Car _____ Year _____

Signature _____

DL# _____ CC# _____

| ☐ CASH | ☐ DISCOVER | ☐ DINERS CLUB |
| ☐ VISA | ☐ AMEX | ☐ DIRECT BILL |
| ☒ MC | ☐ ATM DEBIT | ☐ CHECK |
| ☐ TRADE | ☐ DONATED | |

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| Date In | 1-5-16 | Room - Unit | 123 |
| Date Out | 1-6-16 | | 125 |
| Rate | 58.40 | No. in Room | |
| $ | 53.90 | | |

DAYS OCCUPIED

| | | | | |
|---|---|---|---|---|
| SUN. | 2 | | | |
| MON. | X | | | |
| TUES. | X | | | |
| WED. | | | | |
| THU. | | | | |
| FRI. | | | | |
| SAT. | | | | |
| TOTAL DAYS | | | | 2 |
| Total Room Charge | | | 196 | 28 |
| Misc. | | | 10 | — |
| Tax | | | 19 | 12 |
| | | | | |
| AMOUNT PAID | | | 225 | 40 |

---

# SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

Name _PETE SANTILLI_

Address _ON FILE_

City & State _____ Zip _____

Phone _____

Car License _____ State _____

Make of Car _____ Year _____

Signature _____

DL# _____ CC# _____

| ☐ CASH | ☐ DISCOVER | ☐ DINERS CLUB |
| ☐ VISA | ☐ AMEX | ☐ DIRECT BILL |
| ☐ MC | ☐ ATM DEBIT | ☐ CHECK |
| ☐ TRADE | ☐ DONATED | |

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| Date In | 1-6-15 | Room - Unit | 123 |
| Date Out | 1-8-15 | | 125 |
| Rate | 58.90 | No. in Room | |
| $ | 53.90 | | |

DAYS OCCUPIED

| | | | | |
|---|---|---|---|---|
| SUN. | | | | |
| MON. | | | | |
| TUES. | | | | |
| WED. | X | | | |
| THU. | X | | | |
| FRI. | | | | |
| SAT. | | | | |
| TOTAL DAYS | | | | 2 |
| Total Room Charge | | | 196 | — |
| Misc. | | | 13 | — |
| Tax | | | 19 | 60 |
| | | | | |
| AMOUNT PAID | | | 228 | 60 |

Exhibit F

01/30/2016 2:59 PM FAX  5415733921                                          @0003/0007

## SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

| Date In | 1-8-16 | Room · Unit | 123 |
| Date Out | 1-10-16 | | 125 |
| Rate | 58.90 | No. in Room | |
| $ | 53.90 | DAYS OCCUPIED | |

Name  PETER SANTILLI

Address  ON FILE

City & State_____ Zip_____

Phone_____

Car License_____ State_____

Make of Car_____ Year_____

Signature_____

DL#_____ CC#_____

☐ CASH      ☐ DISCOVER   ☐ DINERS CLUB
☒ VISA      ☐ AMEX       ☐ DIRECT BILL
☒ MC        ☐ ATM DEBIT  ☐ CHECK
☐ TRADE     ☐ DONATED

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| SUN. | | | |
| MON. | | | |
| TUES. | | | |
| WED. | | | |
| THU. | | | |
| FRI. | ☒ | | |
| SAT. | | | |
| TOTAL DAYS | | | 2 |
| Total Room Charge | 196 | — | |
| Misc. | 10 | — | |
| Tax | 19 | 60 | |
| AMOUNT PAID | 225 | 60 | |

## SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

| Date In | 1-10-16 | Room · Unit | 123 |
| Date Out | 1-12-16 | | 125 |
| Rate | 58.90 | No. in Room | |
| $ | 53.90 | DAYS OCCUPIED | |

Name  Pete Santilli

Address_____

City & State_____ Zip_____

Phone_____

Car License_____ State_____

Make of Car_____ Year_____

Signature_____

DL#_____ CC#_____

☐ CASH      ☐ DISCOVER   ☐ DINERS CLUB
☐ VISA      ☐ AMEX       ☐ DIRECT BILL
☐ MC        ☐ ATM DEBIT  ☐ CHECK
☐ TRADE     ☐ DONATED

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| SUN. | ☒ | | |
| MON. | ☒ | | |
| TUES. | | | |
| WED. | | | |
| THU. | | | |
| FRI. | | | |
| SAT. | | | |
| TOTAL DAYS | | | 2 |
| Total Room Charge | 196 | -- | |
| Misc. | 10 | — | |
| Tax | 19 | 60 | |
| AMOUNT PAID | 225 | 60 | |

Exhibit F

**SILVER SPUR MOTEL**
789 North Broadway • Burns, OR 97720
541-573-2077    1-800-400-2077

1-13-16

Name: Pete Santilli

| Date In | Room • Unit |
|---|---|
| 1-12-16 | 123 |
| Date Out | 125 |
| 1-15-16 | |

| Rate | No. in Room |
|---|---|
| 58.90 | |
| $ 53.90 | |

Address _____

City & State _____ Zip _____

Phone _____

Car License _____ State _____

Make of Car _____ Year _____

Signature _____

DL# _____ CC# _____

☐ CASH    ☐ DISCOVER    ☐ DINERS CLUB
☐ VISA    ☐ AMEX    ☐ DIRECT BILL
☒ MC    ☐ ATM DEBIT    ☐ CHECK
☐ TRADE    ☐ DONATED

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| DAYS OCCUPIED | | | |
|---|---|---|---|
| SUN. | | | |
| MON. | | | |
| TUES. | X | | |
| WED. | X | | |
| THU. | X | | |
| FRI. | | | |
| SAT. | | | |
| TOTAL DAYS | | | 3 |
| Total Room Charge | 294 | — | |
| Misc. | 15 | — | |
| Tax | 29 | 40 | |
| AMOUNT PAID | 338 | 40 | |

---

Pd $ 16-16

**SILVER SPUR MOTEL** Pete
789 North Broadway • Burns, OR 97720
541-573-2077    1-800-400-2077

→ 514.00

Name: Pete Santilli    Susan Sm 50.00

Address _____ Pd 1-13-16 ↗    1564.00

| Date In | Room • Unit |
|---|---|
| 1-15-16 | 123 |
| Date Out | 125 |
| 1-20-16 | |

| Rate | No. in Room |
|---|---|
| 58.90 | |
| $ 53.90 | |

City & State _____ Zip _____

Phone _____

Car License _____ State _____

Make of Car _____ Year _____

Signature _____

DL# _____ CC# _____

☐ CASH    ☐ DISCOVER    ☐ DINERS CLUB
☐ VISA    ☐ AMEX    ☐ DIRECT BILL
☐ MC    ☐ ATM DEBIT    ☐ CHECK
☐ TRADE    ☐ DONATED

$50 Pd by Susan J Smith

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| DAYS OCCUPIED | | | |
|---|---|---|---|
| SUN. | X | | |
| MON. | | X | |
| TUES. | | X | |
| WED. | | | |
| THU. | | | |
| FRI. | X | | |
| SAT. | X | | |
| TOTAL DAYS | | | 5 |
| Total Room Charge | 490 | | |
| Misc. | 24 | — | |
| Tax | 49 | 00 | |
| AMOUNT PAID | 504 | — | |

Exhibit F

## SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

Date In: 1-20-16
Date Out: 1-22-16
Room - Unit: 123
Rate: $58.90
No. In Room:

Name: Pete Santilli - Pd by
Address: Kathy of Steelers Nation
City & State_____ Zip_____
Phone_____
Car License_____ State_____
Make of Car_____ Year_____
Signature_____
DL#_____ CC#_____

☐ CASH      ☐ DISCOVER    ☐ DINERS CLUB
☒ VISA      ☐ AMEX        ☐ DIRECT BILL
☐ MC        ☐ ATM DEBIT   ☐ CHECK
☐ TRADE     ☐ DONATED

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| DAYS OCCUPIED | | |
|---|---|---|
| SUN. | | |
| MON. | | |
| TUES. | | |
| WED. | X | |
| THU. | X | |
| FRI. | | |
| SAT. | | |
| TOTAL DAYS | | 2 |
| Total Room Charge | 98 | — |
| Misc. Pets | 10 | — |
| Tax | 9 | 80 |
| AMOUNT PAID | 117 | 80 |

## SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

Date In: 1-20-16
Date Out: 1-22-16
Room - Unit: 125
Rate: $53.90
No. In Room:

Name: Pete Santilli (Kenny's room
Address: Pd by Nancy Lee
City & State: Oreg ▮▮▮▮▮
Phone_____
Car License_____ State_____
Make of Car_____ Year_____
Signature_____
DL#_____ CC#_____

☐ CASH      ☐ DISCOVER    ☐ DINERS CLUB
☒ VISA      ☐ AMEX        ☐ DIRECT BILL
☐ MC        ☐ ATM DEBIT   ☐ CHECK
☐ TRADE     ☐ DONATED

**NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED**
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| DAYS OCCUPIED | | |
|---|---|---|
| SUN. | | |
| MON. | | |
| TUES. | | |
| WED. | X | |
| THU. | X | |
| FRI. | | |
| SAT. | | |
| TOTAL DAYS | | 2 |
| Total Room Charge | 98 | — |
| Misc. | | |
| Tax | 9 | 80 |
| AMOUNT PAID | 107 | 80 |

Exhibit F

## SILVER SPUR MOTEL
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077

Name Pete Santilli – Pd by

Address Nancy Lee

State ___ bm

Phone

Car License ___ State ___

Make of Car ___ Year ___

Signature ___

DL# ___ CC# ___

- ☐ CASH
- ☒ VISA
- ☐ MC
- ☐ TRADE
- ☐ DISCOVER
- ☐ AMEX
- ☐ ATM DEBIT
- ☐ DONATED
- ☐ DINERS CLUB
- ☐ DIRECT BILL
- ☐ CHECK

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| | Date In | Room - Unit |
|---|---|---|
| | 1-22-16 | 123 |
| Date Out | 1-23-16 | 125 |
| Rate 58.90 | $53.90 | No. in Room |

| | | |
|---|---|---|
| SUN. | | |
| MON. | | |
| TUES. | | |
| WED. | | |
| THU. | | |
| FRI. | ✗ | |
| SAT. | | |
| TOTAL DAYS | | 1 |
| Total Room Charge | 98 | — |
| Misc. | Pct | 5 |
| Tax | | 9 80 |
| AMOUNT PAID | | 112 80 |

---

## SILVER SPUR MOTEL Pd
789 North Broadway · Burns, OR 97720
541-573-2077   1-800-400-2077   1-26-16

Name Pete Santilli

Address Brian Wallace Pd $98

City & State reduced charges Zip

Phone To amount on receipt

Car License ___ State ___

Make of Car ___ Year ___

Signature ___

DL# ___ CC# ___

- ☐ CASH
- ☐ VISA
- ☒ MC
- ☐ TRADE
- ☐ DISCOVER
- ☐ AMEX
- ☐ ATM DEBIT
- ☐ DONATED
- ☐ DINERS CLUB
- ☐ DIRECT BILL
- ☐ CHECK

NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED
This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| | Date In | Room - Unit |
|---|---|---|
| | 1-23-16 | 123 |
| Date Out | 1-28-16 | 125 |
| Rate 53.90 | $58.90 | No. in Room |

DAYS OCCUPIED

| | | |
|---|---|---|
| SUN. | ✗ | |
| MON. | ✗ | |
| TUES. | ✗ | |
| WED. | ✗ | |
| THU. | | |
| FRI. | | |
| SAT. | ✗ | |
| TOTAL DAYS | | 5 |
| Total Room Charge | 410 | — |
| Misc. | 15 | — |
| Tax | 41 | — |
| AMOUNT PAID | 466 | — |

Exhibit F

# SILVER SPUR MOTEL

789 North Broadway • Burns, OR 97720
541-573-2077   1-800-400-2077

Name **Deb Jordan**

Address _____ C _____

City & State **Cincinatti Ohio** Zip **45230**

Phone _____

Car License _____ State _____

Make of Car _____ Year _____

Signature _____

DL# _____ CC# _____

☐ CASH        ☐ DISCOVER       ☐ DINERS CLUB
☐ VISA        ☐ AMEX           ☐ DIRECT BILL
☐ MC          ☐ ATM DEBIT      ☐ CHECK
☐ TRADE       ☐ DONATED

## NOTICE TO GUESTS - ADVANCE PAYMENT REQUESTED

This property is privately owned and the management will not be responsible for vandalism, accidents, or injury to guests or for loss of money, jewelry or valuables of any kind.

*Thank You*

| | |
|---|---|
| Date In | Room - Unit |
| 1-28-16 | 123 |
| Date Out | |
| 1-30-16 | 125 |
| Rate 53.90 | No. In Room |
| $ 58.90 | |

**DAYS OCCUPIED**

| | | | |
|---|---|---|---|
| SUN. | | | |
| MON. | | | |
| TUES. | | | |
| WED. | | | |
| THU. | X | | |
| FRI. | X | | |
| SAT. | | | |
| TOTAL DAYS | | | 2 |
| Total Room Charge | | 96 | |
| Misc. | | | |
| Tax | | 19.60 | |
| AMOUNT PAID | | | |

Exhibit F